IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHRYN POLK, | ) | CASE NO.  1:20-CV-02788-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| COMMISSIONER OF SOCIAL SECURITY | ) | |
| ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Kathryn Polk ("Plaintiff" or "Polk"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.     PROCEDURAL HISTORY

In August 2018, Polk filed applications for POD, DIB, and SSI, alleging a disability onset date of November 8, 2017[2] and claiming she was disabled due to: CRPS; chronic pain syndrome; anxiety; arthritis; moderate major depressive disorder; PTSD; and tinnitus.  (Transcript ("Tr.") at 325-26, 339-40, 356, 373.)  The applications were denied initially and upon reconsideration, and Polk requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 183.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

[2] At the hearing, Polk amended her alleged onset date to June 9, 2018.  (Transcript ("Tr.") at 236.)

On December 6, 2019, an ALJ held a hearing, during which Polk, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 4, 2020, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 183-98.)  The ALJ's decision became final on November 5, 2020, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On December 17, 2020, Polk filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15, 17.)  Polk asserts the following assignments of error:

(1) The ALJ erred when he failed to analyze key medical opinion evidence.

(2) The ALJ's decision failed to build an accurate and logical bridge between the medical evidence and the conclusion regarding the claimant's residual functional capacity.

(Doc. No. 15 at 12, 14.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Polk was born in April 1980 and was 38 years-old at the time of her administrative hearing (Tr. 183, 196), making her a "younger" person under Social Security regulations.  20 C.F.R. §§ 404.1563(c), 416.963(c).  She has at least a high school education and is able to communicate in English.  (Tr. 196.) She has past relevant work as a preschool teacher and director, childcare center.  (*Id.*)

### B.    Relevant Medical Evidence[3]

Polk has a history of upper back issues that began after a motor vehicle accident and has diagnoses of failed back surgery syndrome and post-laminectomy syndrome.  (Tr. 665, 685, 697.)

On February 23, 2018, Polk saw Jeffrey Janata, Ph.D., for a behavioral psychotherapy appointment.  (*Id.* at 993-94.)  Polk reported frustration with communications with her medical providers.

---

[3] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

(*Id.* at 994.)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, mild agitation, normal speech, "'frustrated'" mood, congruent, reactive affect, goal-directed thought process, fair insight, and fair judgment.  (*Id.* at 993.)

On May 4, 2018, Polk saw Dr. Janata for follow up.  (*Id.* at 991-92.)  Polk reported her ketamine infusions had been "very helpful" and enabled her "to achieve better pain control and improve her function."  (*Id.* at 992.)  Polk told Dr. Janata an eviction action had been started on the apartment in which she lived as her boyfriend had failed to pay the rent.  (*Id.*)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, mild agitation, normal speech, "'really upset'" mood, congruent, reactive affect, goal-directed thought process, fair insight, and fair judgment.  (*Id.* at 991.)

On May 23, 2018, Polk saw Rachelle Spitz, LISW, at Connections for a mental health assessment. (*Id.* at 744.)  Polk reported receiving psychiatric therapy and counseling at MetroHealth which she would continue for now but was seeking CPST services at Connections as she had no income, was losing her housing at the end of the month, had no support, could not get employment assistance through BVR, and had an application for SSI pending.  (*Id.*)  Polk reported not eating enough and a lack of appetite, which had resulted in a 20-pound weight loss, as well as anxiety, overthinking everything, feeling "socially uncomfortable," worrying she was always doing something wrong, lack of focus, loss of control, and an inability to organize things.  (*Id.* at 748.)  Spitz noted Polk was "angry at everyone who has not helped her" and "feels people didn't do their job which has led to her current situation."  (*Id.* at 749.) Psychological stressors included housing, finances, health, and lack of support.  (*Id.*)  Polk admitted to smoking marijuana a few times a week to help her relax and help with her chronic pain.  (*Id.* at 752.)  Polk

was referred to Connections for CPST services.  (*Id.*)

On June 15, 2018, Polk saw Roanne Amatorio, QMHS, for CPST services.  (*Id.* at 755.)  Amatorio noted Polk "was visibly upset but very motivated."  (*Id.*)  Amatorio offered Polk some suggestions as well as temporary resources for food, clothing, and short-term shelter.  (*Id.*)

On June 22, 2018, Polk underwent a ketamine infusion to treat her cervical post-laminectomy syndrome.  (*Id.* at 685-86.)  Treatment providers noted that Polk's pain prior to the infusion was a 9/10, and after the infusion it was a 5/10.  (*Id.* at 686.)

On July 9, 2018, Polk met with Annie Adelman for support to get free clothing at the thrift store.  (*Id.* at 757.)  Adelman noted Polk "was visibly having a hard time," was "shy," and "did not want to talk or tell her story to others at the thrift store when they began to ask questions."  (*Id.*)  While Polk appreciated the clothing and Adelman's help, she was "exhausted and did not like the process," she was embarrassed to need free clothing, and she did not like that the thrift store employees were "nosey."  (*Id.*)  Adelman noted Polk would meet with her regular CPST for assistance with Social Security, housing, and stability.  (*Id.*)

On July 11, 2018, Brittany Freese, LISW-S, followed up with Polk by telephone as Polk had reported to her case manager in June that she wanted to close her case.  (*Id.* at 842.)  Freese noted Polk "was very focused on the past" and "on external blame toward others for her current circumstances."  (*Id.*)  Freese found Polk tearful at times and agitated at times, and Polk repeatedly told Freese, "You guys are liars."  (*Id.*)  Polk confirmed she wanted to terminate all services with Recovery Resources, and informed Freeze she would continue counseling with MetroHealth and that she had gotten a case manager at Connections.  (*Id.* at 843.)  Polk blamed Recovery Resources for her eviction and current living situation of going couch to couch.  (*Id.*)

That same day, Polk saw Dr. Janata for follow up.  (*Id.* at 989-90.)  Polk reported continued

4

ketamine infusions, which she found to help alleviate her pain to some extent and improve her function. (*Id.* at 990.)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, mild agitation, normal speech, "'frustrated'" mood, congruent, reactive affect, goal-directed thought process, fair insight, and fair judgment.  (*Id.* at 989.)

On July 16, 2018, Polk met with Amatorio for CPST services.  (*Id.* 759.)  Amatorio noted Polk was "visibly upset and emotional."  (*Id.*)  Amatorio followed up with Polk regarding the result of her eviction hearing and provided resources for housing.  (*Id.*)  Polk asked for CPST to accompany her to the food and clothing pantry for her next appointment.  (*Id.* at 760.)

On August 1, 2018, Polk saw Dr. Janata for follow up.  (*Id.* at 987-88.)  Dr. Janata noted Polk was "grateful for the improvements in function and the reductions in pain that ketamine infusions have allowed, but she remains fixated on and frustrated by the lack of responsiveness by members of the pain management team and staff."  (*Id.* at 988.)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, mild agitation, normal speech, "'improved a bit'" mood, congruent, reactive affect, goal-directed thought process, fair insight, and fair judgment.  (*Id.* at 987.)

On August 3, 2018, Polk saw Kutaiba Tabaa, M.D., for a second opinion of her chronic back pain, as her treatment providers at University Hospitals were recommending a spinal pain pump.  (*Id.* at 694.)  Polk reported right arm pain that radiated to her fingers and that ranged from a 6/10 to a 10/10.  (*Id.*)  Polk rated her pain that day as an 8/10.  (*Id.*)  Polk described her pain as constant, aching, and sharp, and it interfered with her sleep and activities of daily living.  (*Id.*)  Lifting aggravated her pain, while nothing alleviated it.  (*Id.*)  Dr. Tabaa reviewed Polk's Cleveland Clinic pain records.  (*Id.* at 694-95.)  Dr. Tabaa noted under "Subjective" that Polk "was always unhappy with my questions since my nurse asked her

those!!! From the beginning had a very sarcastic [sic] and rolling her eye up!!"  (*Id.* at 695.)  On examination, Dr. Tabaa found normal musculoskeletal range of motion and gait, as well as no hyperalgesia, allodynia, atrophy, or trophic changes in the right arm.  (*Id.* at 696.)  Dr. Tabaa noted Polk reported her right arm was "very painful" and she was "losing function" of it, but after she got upset with Dr. Tabaa, "she was vigorously writing with her Rt arm without discomfort."  (*Id.*)  Dr. Tabaa found Polk's memory normal, her affect labile and inappropriate, and that she was agitated and expressed impulsivity.  (*Id.*)  Polk's diagnoses included fibromyalgia, post-laminectomy syndrome, complex regional pain syndrome Type 1 of the right upper extremity, panic attack, tobacco use, major depressive disorder, recurrent episode, moderate, and spinal stenosis.  (*Id.*)  Dr. Tabaa recommended pool therapy, smoking cessation, an IV infusion, a regular strength and flexibility program, and no chronic opioid therapy.  (*Id.*)  Dr. Tabaa discussed alternative chronic pain therapies with Polk.  (*Id.*)  Dr. Tabaa noted Polk should return to care with another doctor or the certified nurse practitioner, as Polk did not like Dr. Tabaa.  (*Id.*)  The following notation appears under "Pain Assessment":

> She is positive for depression.  Her duration for standing is less than 5 minutes, sitting is less than 5 minutes, and walking is less than 5 minutes. Pain level is currently 8/10.  Pain ranges between 8/10 and 10/10[.]  She has problems with her sex life.  She has problems sleeping due to pain.

(*Id.* at 697.)

On August 15, 2018, Polk underwent another ketamine infusion, which reduced her pain from a 9/10 to a 0/10.  (*Id.* at 1019-20.)

On August 27, 2018, Polk saw Rosanne Radziewicz, PCNS, for pharmacological management. (*Id.* at 1182.)  Polk reported feeling groggy and always tired since starting Remeron, although she was feeling "less stressed" and had went on a camping trip and met some new friends.  (*Id.* at 1183-84.)  Polk described her mood as "'fine,'" although it varied with stress and triggers, and she reported she was numb

6

and depressed.  (*Id.* at 1184.)  Her panic attacks remained the same, although she was trying to handle them better, and she was taking caffeine pills for energy.  (*Id.*)  Polk reported improvement with her nightmares and that she had been doing well with her bingeing and purging until an issue with her ex-boyfriend.  (*Id.*)  Polk reported using her clonazepam "sparingly."  (*Id.*)  Polk reported being in "'a lot of pain'" that day.  (*Id.* at 1185.)

On examination, Radziewicz found Polk adequately groomed with good hygiene and less restless and more relaxed behavior.  (*Id.*)  Polk demonstrated spontaneous speech with a normal rate and flow, and a logical, organized thought process.  (*Id.*)  Polk was defensive, had a victim perspective, was "dissatisfied with reactions of others," and thought things would be easier if she were dead.  (*Id.*)  Polk exhibited a dysphoric mood that was less guarded, a more smiling affect although she was tearful at times, sustained attention/concentration, normal recent and remote memory, and fair judgment and insight.  (*Id.*)  Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function."  (*Id.* at 1186.)  Radziewicz stated Polk "presented today in better spirits despite reporting that she is very stressed triggered [sic] by the responses of others that she perceived were negative and then . [sic]  She reports her mood is 'fine' and later stated that her reactions have not changed significantly except for decreased frequency of panic attacks and fewer nightmares."  (*Id.*)  Radziewicz noted Polk was less tearful.  (*Id.*)  Polk's diagnoses included major depressive disorder, recurrent, moderate, generalized anxiety disorder, panic attacks, PTSD, rule out somatic symptom disorder, cluster B traits with history of unstable relationships, and chronic regional pain syndrome.  (*Id.*)  Radziewicz noted Polk "has not significantly responded to SSRI/SNRIs" for management of her mood and anxiety symptoms.  (*Id.*)

On September 21, 2018, Polk saw Dr. Janata for follow up.  (*Id.* at 985-86.)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, mild agitation,

normal speech, "'terrible'" mood, congruent, reactive affect, goal-directed thought process, fair insight, and fair judgment. (*Id.* at 985.)

On September 25, 2018, Polk saw Mary Kay Zane, PT, OCS, for a physical therapy appointment. (*Id.* at 969.)  Polk rated her pain as a 9/10 and described it as constant but variable in intensity.  (*Id.* at 970.)  Her pain was at its best at a 4/10 for one to two weeks after ketamine injections.  (*Id.*)  On average, her pain was a 7-8/10.  (*Id.*)  Polk described her pain as sharp, burning, aching, shooting, throbbing, tingling/prickling, stabbing, and sore. (*Id.*)  Polk reported her arm pain worsened with standing for two minutes and she was exhausted after walking one block.  (*Id.*)  She woke five to six times a night.  (*Id.*)  Her pain worsened with lifting, carrying, dressing, and bathing, and was alleviated with medication, foam roller, heat, TENS unit, rest, and avoiding using her right arm.  (*Id.*)  Zane noted:

> Pt crying with initial history story, frustrated at having to repeat her c/o and story to another practitioner.  Pt holding her right arm with hand at her chest, arm into her side.  As pt relaxed during the history she began to gesture with that arm at waist level only.

(*Id.* at 971.)  Muscle strength testing was deferred due to Polk's tolerance and pain.  (*Id.*)  On examination, Zane found posture dysfunction, first rib ring rotation with compensatory clavicle positioning and right-sided restriction, and biceps contracture.  (*Id.* at 972-73.)  Polk's problems included pain, decreased range of motion, decreased strength, decreased flexibility, decreased function, postural deviation, inactivity, and helplessness.  (*Id.* at 973.)

On October 10, 2018, Polk saw Zane for her second physical therapy appointment.  (*Id.* at 960.)  Polk reported her pain was a 9/10, she could not hold her head up, and her right forearm and hand were hurting.  (*Id.* at 961.)  Zane noted Polk was able to transition from sitting to standing and walk normally, and she carried her purse without difficulty.  (*Id.*)  On examination, Zane found normal muscle tone of the right upper trap and thoracic outlet, and she observed no deficits regarding Polk's head over her shoulders.  (*Id.*)  Zane found Polk in distress over her eviction and crying at the beginning of the appointment.  (*Id.* at

962.)  Polk complained of reduced sleep and ongoing pain.  (*Id.*)  Zane found Polk "cooperative with some

fear avoidance behavior." (*Id.*)  Zane noted:

> Pt was avoidant of looking at her arm, tearful.  Pt refused to look at her arm
> for instruction on how to position for home.  Pt stated she could not turn her
> head so she could not look. (pt showed 30-35deg on IE)
>
> I made pt aware of the avoidance she was demonstrating.  She commented she
> had been through therapy many times and knows what to do.  I asked her for
> suggestions of what she would like to do but was not able to answer/articulate.
> I also observed her turning her head freely while talking about this issue.
>
> Other:
>
> The pt felt the above treatment was disrespectful and that the therapist was
> condesending [sic]. . . . I asked the pt if she would prefer another provider, I
> could move her to someone else.  The pt just said thank you and left without
> further comment.

(*Id.*)

On October 15, 2018, Polk underwent another ketamine infusion, which reduced her pain from a

9/10 to a 5/10.  (*Id.* at 1021-22.)

On October 23, 2018, Polk saw Radziewicz for pharmacological management.  (*Id.* at 1117.)  Polk

reported a "'not good'" mood, "'real bad'" panic attacks, feelings of absolute hopelessness, crying, feeling

like she could not go on like this, nightmares, and occasionally "out of control" bingeing/purging.  (*Id.* at

1119.)  Radziewicz noted Polk's energy appeared stable.  (*Id.*)  Polk admitted to taking her medications

sparingly, except for mirtazapine, which she took daily.  (*Id.*)

On examination, Radziewicz found Polk adequately groomed with good hygiene and less restless

and more relaxed behavior.  (*Id.* at 1120.)  Polk demonstrated spontaneous speech with a normal rate and

flow and a logical, organized thought process.  (*Id.*)  Polk was defensive and "easily triggered by

appraisals of others or unhelpful medical staff as she feels unable to concentrate or direct her activities

because of feeling overwhelmed." (*Id.*)  Polk exhibited a dysphoric mood that was less guarded, a smiling

affect although she was tearful at times, sustained attention/concentration, normal recent and remote memory, and fair judgment and insight.  (*Id.*)  Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function."  (*Id.* at 1121.)  Polk denied auditory or visual hallucinations and expressed "improvement with the care of her three mental health practitioners."  (*Id.* at 1120.)  Polk's diagnoses remained the same.  (*Id.* at 1121.)  Radziewicz noted Polk "has not significantly responded to SSRI/SNRIs" for management of her mood and anxiety symptoms.  (*Id.*)  Radziewicz increased Polk's medication.  (*Id.* at 1122.)

That same day, Polk saw Shira Fass, Ph.D., for counseling.  (*Id.* at 1128.)  Polk reported feeling isolated and wanting to meet new people.  (*Id.* at 1129.)  Dr. Fass noted Polk did not report any pain that day.  (*Id.*)  On examination, Dr. Fass found Polk adequately groomed with a depressed and anxious mood, full affect, cooperative, tearful behavior, spontaneous and normal speech, logical and organized thought process, tight association, good judgment and insight, normal memory, and sustained attention and concentration.  (*Id.*)

On October 30, 2018, Polk saw Paola Sanchez, QMHS, for CPST services.  (*Id.* at 1059.)  Sanchez noted Polk was sad, angry, and anxious.  (*Id.*)  Sanchez provided Polk with resources for housing in safe areas and discussed Polk's immediate needs.  (*Id.* at 1059-60.)  Sanchez offered Polk alternatives to housing after her application for Eden was denied.  (*Id.* at 1060.)  Polk reported she needed clothing and a winter coat, as well as some monetary resources.  (*Id.*)  Sanchez told Polk at they would try to address her needs at the next appointment but that she needed "to take everything one day at a time to promote mental stability."  (*Id.*)

On November 5, 2018, Polk saw Sanchez for CPST services.  (*Id.* at 1063.)  Sanchez noted Polk was "anxious," "very talkative," and had a "negative outlook on housing."  (*Id.*)  Polk admitted she had not called the housing list because she did not have the energy and she felt it was pointless since she had

10

been trying for a while now and had not gotten anywhere even with a case manager.  (*Id.* at 1064.)  Polk refused any applications for the east side of Cleveland, although she accepted an application for group housing at Eden.  (*Id.*)

On November 12, 2018, Polk saw Dr. Janata for follow up.  (*Id.* at 983-84.)  Polk reported "reasonably good" pain control and that her ketamine infusions were helping.  (*Id.* at 984.)  Dr. Janata noted Polk's "recent interactions with the pain management service have been more positive" and she had no complaints about the service today.  (*Id.*)  Polk denied suicidal ideation.  (*Id.*)  Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat improved, she is better prepared to deal with this particular life stress."  (*Id.*)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, normal speech, depressed, reactive affect, goal-directed thought process, good insight, and fair judgment.  (*Id.* at 983.)

On November 14, 2018, Polk saw Sanchez for CPST services.  (*Id.* at 1336.)  Sanchez noted Polk was sad and negative.  (*Id.*)  Polk admitted she did not reach out to any resources, such as housing or REC centers, that were given to her before because she "'just didn't get to it.'"  (*Id.* at 1337.)  Sanchez helped Polk complete an application for an apartment building and called Lakewood Municipal Court on Polk's behalf to find out information about her eviction.  (*Id.*)

On November 16, 2018, Polk underwent another ketamine infusion, which reduced her pain from an 8/10 to a 0/10.  (*Id.* at 1023-24.)

On November 28, 2018, Dr. Fass opined that  an emotional support animal would help Polk "manage and reduce" her mental health symptoms.  (*Id.* at 1534.)

On November 29, 2018, Polk saw Sanchez for CPST services.  (*Id.* at 1072.)  Sanchez noted Polk

was alert, overwhelmed, and responsive.  (*Id.* at 1073.)  Sanchez assisted Polk with a call relating to a housing application.  (*Id.*)  Polk reported her car had broken down and Sanchez referred her to 211 for cash assistance resources.  (*Id.* at 1073.)

On December 4, 2018, Polk saw Radziewicz for pharmacological management.  (*Id.* at 1080.) Polk reported she "continue[d] to struggle with people not responding to her needs."  (*Id.* at 1082.)  Polk told Radziewicz she had been homeless since August and she stayed with various people.  (*Id.*) Radziewicz noted Polk was "[t]earful that PT was switched and that she had significant pain following simple exercise to strengthen her neck."  (*Id.*)  Polk reported a "declining" mood, trouble with lack of sunshine, daily tearfulness and hopelessness, feeling like her heart is always racing and constantly on edge, agitated, nervous energy, crying, and feeling like she could not go on like this.  (*Id.*)  Polk further reported a lot of energy to the point she could not sleep or no energy and feeling drained.  (*Id.*)  She also experienced nightmares and was binging/purging.  (*Id.*)  Polk admitted to taking her clonazepam "sparingly" and reported she did not feel any effect from her antidepressant therapy.  (*Id.*)  Polk reported suicidal thoughts but said she would not act on them out of concern for how her family would react.  (*Id.* at 1084.)

On examination, Radziewicz found Polk adequately groomed with good hygiene and less restless and more relaxed behavior.  (*Id.* at 1083.)  Polk demonstrated spontaneous speech with a normal rate and flow and a logical, organized thought process.  (*Id.*)  Polk was talkative but she was defensive and "easily triggered by appraisals of others or unhelpful medical staff as she feels unable to concentrate or direct her activities because of feeling overwhelmed."  (*Id.*)  Polk exhibited a dysphoric mood that was less guarded, a smiling affect although she was tearful at times, sustained attention, normal recent and remote memory, and fair judgment and insight.  (*Id.*)  Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function."  (*Id.* at 1084.)  Polk "appeared focused" on her pain and

"demonstrate[d] a high emotionality related to many stressors and this can worsen her pain and has developed a reaction to healthcare providers who have delayed or not responded in a helpful way to her symptoms which trigger her low self worth." (*Id.*) Polk's diagnoses remained the same. (*Id.* at 1084-85.) Radziewicz noted Polk "has not significantly responded to SSRI/SNRIs" for management of her mood and anxiety symptoms. (*Id.* at 1085.)

On December 17, 2018, Polk underwent another ketamine infusion, which reduced her pain from an 8/10 to a 4/10. (*Id.* at 1710-11.)

On December 20, 2018, Polk saw Melinda Lawrence, M.D., for complaints of facial pain. (*Id.* at 1371.) Polk reported her average pain the past week was a 5/10 and her worst pain was an 8/10. (*Id.*) Polk told Dr. Lawrence that "the amount of pain relief she is now obtaining from her current pain reliever(s) is enough to make a real difference in her life." (*Id.*) Dr. Lawrence noted Polk took Topamax, tramadol, and ibuprofen, which provided "moderate pain relief" in combination, and that Polk received "significant pain relief" for one month after each ketamine infusion. (*Id.*) Polk reported a good response to her pain medication and improved activities of daily living. (*Id.*) On examination, Dr. Lawrence found full range of motion of the neck, limited active range of motion of the right arm but full range of motion on passive motion, negative Hoffman sign, normal gait, normal motor strength, normal sensation, and normal mood and affect. (*Id.* at 1374.) Dr. Lawrence noted Polk's pain was well controlled on her current medication regimen. (*Id.* at 1376.)

On January 9, 2019, Polk saw Dr. Janata for follow up. (*Id.* at 1422-23.) Polk reported "reasonably good" pain control and that her ketamine infusions were helping, although "[h]er pain tends to slowly worsen as she nears the end of the month between infusions." (*Id.* at 1423.) Polk denied suicidal ideation. (*Id.*) Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat

improved, she is better prepared to deal with this particular life stress." (*Id.*)  On examination, Dr. Janata found Polk fully oriented with grossly intact memory, normal attention and distractible concentration, neat appearance, cooperative behavior and tearful attitude, good eye contact, normal speech, "'okay'" mood, depressed, reactive affect, goal-directed thought process, good insight, and fair judgment.  (*Id.* at 1422.)

Polk continued to receive ketamine infusions in 2019.  On January 18, 2019, Polk underwent a ketamine infusion which reduced her pain from a 7/10 to a 1/10.  (*Id.* at 1712-13.)

On January 18, 2019, Nurse Radziewicz completed a Mental Capacity Medical Source Statement. (*Id.* at 1408-10.)  The cover letter to this form notes that while Polk had been compliant with treatment visits and medications, Polk had not reported any improvement in her mood or emotionality.  (*Id.* at 1408.) Radziewicz opined that Polk had moderate impairments in the following areas: cooperating with others; asking for help when needed, handling conflicts with others; responding to requests, suggestions, criticisms, correction, and challenges; working a full day without needing more than the allotted number or length of rest periods during the day; and responding to demands.  (*Id.* at 1409-10.)  Radziewicz further opined Polk had a "marked" limitation in her ability to manage her psychologically based symptoms.  (*Id.* at 1410.)

Polk continued to meet with her case manager throughout 2019 for help with housing, food assistance, and government assistance.  (*Id.* 1416-17, 1465.)

On February 13, 2019, Polk saw Dr. Janata for follow up.  (*Id.* at 1424-25.)  Polk denied suicidal ideation.  (*Id.* at 1425.)  Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat improved, she is better prepared to deal with this particular life stress." (*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes.  (*Id.* at 1424-25.)

On February 19, 2019, Polk saw Radziewicz for pharmacological management.  (*Id.* at 1439.)

14

Polk reported she had "been able to refrain from spinning out of control." (*Id.* at 1441.) Polk told Radziewicz she had been homeless, and she stayed with various people. (*Id.*) Polk reported a depressed mood and feelings of hopelessness. (*Id.*) Her panic attacks had improved, although Polk could become anxious quickly with unpredictability. (*Id.*) Polk further reported a lot of energy to the point she could not sleep or no energy and feeling drained. (*Id.*) She also experienced poor sleep and was binging/purging. (*Id.*) Polk admitted to taking her clonazepam "sparingly" and reported she did not feel any effect from her antidepressant therapy. (*Id.*) Polk reported suicidal thoughts because she did not how long she could hang on without stable housing. (*Id.* at 1443.) Polk also complained of right shoulder and neck pain that she rated a 6-7/10. (*Id.*)

On examination, Radziewicz found Polk adequately groomed with good hygiene, a relaxed position, engaged behavior, and good eye contact. (*Id.* at 1442.) Polk demonstrated spontaneous speech with a normal rate and flow, and logical, organized thought process. (*Id.*) Polk was talkative but she was defensive and "easily triggered by appraisals of others or unhelpful medical staff as she feels unable to concentrate or direct her activities because of feeling overwhelmed." (*Id.*) Polk exhibited a dysphoric, pleasant, and at ease mood, a smiling affect although she was tearful at times, sustained attention, normal recent and remote memory, and fair judgment and insight. (*Id.* at 1442-43.) Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function." (*Id.* at 1443.) Polk's diagnoses remained the same. (*Id.*) Radziewicz noted Polk "has not significantly responded to SSRI/SNRIs" for management of her mood and anxiety symptoms. (*Id.* at 1444.)

On February 20, 2019, Polk saw Dr. Fass for follow up. (*Id.* at 1433.) Dr. Fass noted Polk was tearful when discussing her current living situation and that Polk did not report any pain that day. (*Id.* at 1433-34.) On examination, Dr. Fass found Polk adequately groomed with a depressed and anxious mood, full range of affect, tearful behavior, spontaneous and normal speech, logical and organized thought

15

process, tight association, good judgment and insight, normal memory, and sustained attention and concentration.  (*Id.* at 1434.)  Dr. Fass noted Polk was irritable and her symptoms were unchanged.  (*Id.*)

On March 26, 2019, Polk saw Radziewicz for pharmacological management.  (*Id.* at 1477.) Radziewicz's previous appointment had run long, and Polk was "upset," frustrated with the late start of her appointment, felt "slighted," and was "unable to tolerate questions during interview."  (*Id.* at 1479.) Polk continued to imply suicidal thoughts because she did not how long she could hang on without stable housing.  (*Id.* at 1481.)  Polk also complained of right shoulder and neck pain that she rated a 6-7/10.  (*Id.*)

On examination, Radziewicz found Polk adequately groomed with good hygiene, a relaxed position, engaged behavior, and diverted eye contact.  (*Id.* at 1480.)  Polk demonstrated spontaneous speech with a normal rate and flow, and logical, organized thought process.  (*Id.*)  Polk was talkative but she was defensive, "feeling slighted and mildly threatening about how much she will tolerate."  (*Id.*)  Polk exhibited a dysphoric, withdrawn mood, a constricted and tearful affect, sustained attention, normal recent and remote memory, and fair judgment and insight.  (*Id.*)  Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function."  (*Id.* at 1481.)  Polk's diagnoses remained the same.  (*Id.*)

On March 27, 2019, Polk underwent a ketamine infusion which reduced her pain from a 9/10 to a 4/10.  (*Id.* at 1714-15.)

On April 11, 2019, Polk saw Dr. Lawrence for follow up.  (*Id.* at 1589.)  Polk reported her average pain the past week was a 5/10 and her worst pain was an 8/10.  (*Id.*)  Polk described her pain as constant, and worse with lifting heavy objects or raising her right arm above shoulder level.  (*Id.*)  Polk told Dr. Lawrence that "the amount of pain relief she is now obtaining from her current pain reliever(s) is enough to make a real difference in her life."  (*Id.*)  Dr. Lawrence noted Polk took Topamax, tramadol, and ibuprofen, which provided "moderate pain relief" in combination, and that Polk received "significant pain

16

relief" for one month after each ketamine infusion.  (*Id.*)  Polk had undergone physical therapy in the past and was going to participate in another physical therapy session soon.  (*Id.*)  Polk denied any upper extremity weakness.  (*Id.*)

On examination, Dr. Lawrence found full range of motion of the neck, limited active range of motion of the right arm but full range of motion on passive motion, negative Hoffman sign, normal gait, normal motor strength, normal sensation, normal reflexes, and normal mood and affect.  (*Id.* at 1592.)  Dr. Lawrence noted Polk's pain was well controlled on her current medication regimen.  (*Id.*)

On April 15, 2019, Polk saw Dr. Janata for follow up.  (*Id.* at 1578.)  Dr. Janata noted Polk "continue[d] to find ketamine infusions helpful in relieving her pain to a degree and enabling improved function."  (*Id.*)  Polk reported continuing to look for alternative housing.  (*Id.*)  Polk continued to be depressed and her depression was mostly situational.  (*Id.*)  Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat improved, she is better prepared to deal with this particular life stress." (*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes.  (*Id.*)

On April 30, 2019, Polk saw Radziewicz for pharmacological management.  (*Id.* at 1493.)  Polk reported things were not good, that she felt anxious and exhausted much of the time, she had poor appetite and repeated bulimic episodes, and nightmares.  (*Id.* at 1497.)  Polk was triggered by "negative appraisals" by family members, issues with her pain medication, and her ex-boyfriend driving by her house and threatening her.  (*Id.*)  Polk also complained of right shoulder and neck pain that she rated a 9/10.  (*Id.*)  Polk reported suicidal thoughts.  (*Id.*)  Radziewicz noted Polk's PHQ-9 and GAD-7 scores had "not improved significantly with current treatment," and Polk agreed to make a medication change.  (*Id.*)

On examination, Radziewicz found Polk adequately groomed with good hygiene, a relaxed position, engaged and more relaxed behavior, open posture, and good eye contact.  (*Id.* at 1496.)  Polk

17

demonstrated spontaneous speech with a normal rate and flow and a logical, organized thought process. (*Id.*)  Polk was talkative and "[a]dmitted more openly to triggers, stressors, bulimia, [and] sadness about transitioning to [a] new provider." (*Id.*)  Polk exhibited a mood that was dysphoric at times but euthymic overall, a tearful and stable affect, sustained attention, normal recent and remote memory, and fair judgment and insight. (*Id.*)  Radziewicz noted Polk "presented with symptoms of MDD . . . and anxiety . . . that has impacted her function." (*Id.* at 1497.)  Polk's diagnoses remained the same. (*Id.*)

On May 1, 2019, Polk saw Dr. Janata for follow up. (*Id.* at 1576-77.)  Dr. Janata again noted Polk "continue[d] to find ketamine infusions helpful in relieving her pain to a degree and enabling improved function." (*Id.* at 1576.)  An issue with Polk's pain medication had "led to dramatically increased anxiety, which in turn accelerate[d] her pain." (*Id.*)  Polk continued to be depressed and her depression was mostly situational. (*Id.*)  Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat improved, she is better prepared to deal with this particular life stress." (*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes. (*Id.*)

On May 20, 2019, Polk saw Dr. Janata for follow up. (*Id.* at 1575.)  Dr. Janata noted Polk was "struggling with considerable psychosocial pressure," although one stressor had been resolved as Polk had been approved for subsidized housing and moved into an apartment. (*Id.*)  Dr. Janata further noted Polk "continue[d] to find ketamine infusions helpful in relieving her pain to a degree and enabling improved function." (*Id.*)  Polk's continued struggle with how the pain management division was run had "been somewhat muted" and Polk "continue[d] to report significant pain relief." (*Id.*)  Polk continued to be depressed and her depression was mostly situational. (*Id.*)  Dr. Janata noted, "Although as noted above she feels stressed at some of the issues she is confronting, the fact that her pain is better-controlled and her mood is, as a result, somewhat improved, she is better prepared to deal with this particular life stress."

18

(*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes.  (*Id.*)

On May 29, 2019, Nurse Radziewicz wrote a letter on Polk's behalf to Cuyahoga County Jobs and Family Services.  (*Id.* at 1531.)  Radziewicz opined Polk was "disabled and unable to work and should continue her benefits and food stamps."  (*Id.*)

On June 24, 2019, Polk saw Dr. Janata for follow up.  (*Id.* at 1690-91.)  Dr. Janata noted Polk "continue[d] to find ketamine infusions helpful in relieving her pain to some degree and enabling improved function."  (*Id.* at 1690.)  Polk continued to be depressed and her depression was mostly situational.  (*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes. (*Id.* at 1690-91.)

On June 25, 2019, Polk saw Dr. Lawrence for follow up and medication refills.  (*Id.* at 1585.)  Dr. Lawrence again noted "significant improvement" in Polk's pain and improvement in Polk's function on her current treatment regimen, and that Polk was "able to work with this combined treatment regimen." (*Id.*)  Polk continued to do stretches and exercises.  (*Id.*)  On examination, Dr. Lawrence found no edema and normal mood and affect.  (*Id.* at 1588.)  Dr. Lawrence continued Polk's medication.  (*Id.*)

On July 9, 2019, Polk saw Karen Collins, APRN-CNP, for pharmacologic management.  (*Id.* at 1516.)  Polk reported seeing shadows out of the corners of her eyes and hearing her name called every so often.  (*Id.* at 1519.)  Polk told Collins she did not feel her pain as much when she was moving or focused on something.  (*Id.*)  Polk reported walking and being with her emotional support cat when she got anxious.  (*Id.*)  Polk told Dr. Collins being outside made her happy.  (*Id.*)  Polk reported back, right shoulder, and neck pain that she rated a 10/10.  (*Id.* at 1520.)  On examination, Collins found Polk adequately groomed with good hygiene and cooperative, guarded, and irritated behavior.  (*Id.* at 1519.) Polk demonstrated spontaneous speech with a normal rate and flow and a logical, organized thought process.  (*Id.*)  Polk was talkative and exhibited a depressed, anxious, and irritable mood, a full range of

affect, sustained attention, normal recent and remote memory, and fair judgment and insight.  (*Id.*)  Collins adjusted Polk's medications.  (*Id.* at 1520-21.)

On July 24, 2019, Polk underwent a ketamine infusion which reduced her pain from a 10/10 to a 3/10.  (*Id.* at 1716-17.)  On August 21, 2019, Polk underwent a ketamine infusion which reduced her pain from a 9/10 to a 3/10.  (*Id.* at 1718-19.)

On September 16, 2019, Polk saw Dr. Janata for follow up.  (*Id.* at 1692-93.)  Polk denied suicidal ideation.  (*Id.* at 1692.)  Dr. Janata noted Polk's physical function "continues to be significantly impaired" despite the benefit she received from her ketamine infusions.  (*Id.*)  Dr. Janata described Polk's mood symptoms as "severe" and noted she was "demoralized, increasingly hopeless, feeling isolated and unsupported, [and] adrift socially and occupationally."  (*Id.*)  Dr. Janata expressed concerns about Polk's mood and mood fragility and increased the frequency with which Polk met with him.  (*Id.*)  Dr. Janata did not record any examination findings from this visit in his treatment notes.  (*Id.* at 1692-93.)

On September 18, 2019, Polk underwent a ketamine infusion which reduced her pain from an 8/10 to a 4/10.  (*Id.* at 1720-21.)

On October 1, 2019, Polk saw Dr. Fass for follow up.  (*Id.* at 1625.)  Dr. Fass noted Polk was tearful and seemed agitated.  (*Id.*)  Polk reported she was tired and angry, and while she did everything right, no one cared.  (*Id.*)  Polk felt things were unfair.  (*Id.*)  On examination, Dr. Fass found Polk adequately groomed with a depressed and anxious mood, full range of affect, cooperative, agitated, and tearful behavior, spontaneous and normal speech, logical and organized thought process, tight association, good judgment and insight, normal memory, and sustained attention and concentration.  (*Id.* at 1626.)  Dr. Fass noted Polk did not report any pain that day.  (*Id.*)

On October 4, 2019, Polk saw Dr. Lawrence for back pain, which Polk rated as a 3/10 that day.  (*Id.* at 1704.)  Dr. Lawrence noted Polk had tried several non-opioid medication classes and the best pain

control Polk received was from ketamine infusions, which she received on as needed basis. (*Id.* at 1704-05.) Dr. Lawrence stated Polk "has made significant improvements overall with her mood," which played into her pain, and Polk was "happy with her current course of treatment." (*Id.* at 1705.) Dr. Lawrence observed Polk was "much more functional than she was when we first started seeing each other." (*Id.*) On examination, Dr. Lawrence found no edema, grossly normal gait, and normal mood and affect. (*Id.* at 1707.) Dr. Lawrence continued Polk's medication. (*Id.* at 1709.)

On October 7, 2019, Polk saw Dr. Janata for follow up. (*Id.* at 1694-95.) Dr. Janata again noted Polk's physical function "continues to be significantly impaired" despite the benefit she received from her ketamine infusions. (*Id.* at 1694.) Dr. Janata again described Polk's mood symptoms as "severe" and noted she was "demoralized, increasingly hopeless, feeling isolated and unsupported, [and] adrift socially and occupationally." (*Id.*) Dr. Janata again expressed concerns about Polk's mood and mood fragility and increased the frequency with which Polk met with him. (*Id.*) Dr. Janata did not record any examination findings from this visit in his treatment notes. (*Id.* at 1694-95.)

On October 15, 2019, Polk saw Collins for pharmacologic management. (*Id.* at 1631.) Polk reported she was "very angry," and no medication was going to help that. (*Id.* at 1632.) Polk expressed frustration that she could not get in to see Collins sooner and that she wanted to see Collins more often. (*Id.*) Polk complained of back pain that she rated a 9/10. (*Id.* at 1633.) On examination, Collins found Polk adequately groomed with good hygiene and cooperative, agitated, and appropriate behavior. (*Id.* at 1632.) Polk demonstrated spontaneous speech with a normal rate and flow and a logical, organized thought process. (*Id.*) Polk was talkative and exhibited a depressed mood, a full range of affect, sustained attention, normal recent and remote memory, and fair judgment and insight. (*Id.* at 1632-33.) Collins adjusted Polk's medications. (*Id.* at 1634.)

On October 16, 2019, Polk saw Emily White, Ph.D., for a diagnostic assessment relating to her

21

eating disorder.  (*Id.* at 1639.)  Polk reported right shoulder, arm, and collar bone pain that she rated as a 9/10.  (*Id.* at 1640.)  Polk told Dr. White the onset of her eating disorder was at age 15.  (*Id.*)  There were periods of time when she binged/purged little or not at all, including when she stayed with a friend for almost a year because she felt safe and secure in the living situation and had good support from him.  (*Id.*)  Polk reported she did not even think of purging when she was staying there.  (*Id.*)  Dr. White noted Polk's PHQ-9 was positive for severe depression and her GAD-7 was positive for severe anxiety.  (*Id.* at 1642.)  On examination, Dr. White found Polk adequately groomed and fully oriented, with sustained concentration and cooperative behavior, an okay and anxious mood, congruent affect, clear, normal speech, a logical and organized thought process, poor to fair insight and judgment, and expressions of eating disorder cognitions.  (*Id.*)  Dr. White diagnosed Polk with "[o]ther specified eating disorder" and noted food logs would be important to determine if Polk was engaging in subjective or objective bingeing episodes.  (*Id.* at 1643.)

On October 22, 2019, Polk saw Dr. Fass for follow up.  (*Id.* at 1666.)  Polk reported being physically tired, feeling sick, and feeling ambivalent about completing her food log.  (*Id.*)  Dr. Fass noted Polk did not report any pain that day.  (*Id.*)  On examination, Dr. Fass found Polk adequately groomed with a depressed and anxious mood, full range of affect, cooperative, agitated, and tearful behavior, spontaneous and normal speech, logical and organized thought process, tight association, good judgment and insight, normal memory, and sustained attention and concentration.  (*Id.* at 1667.)  Dr. Fass noted Polk's symptoms remained unchanged and that Polk was agitated.  (*Id.*)

On October 30, 2019, Dr. Janata wrote a letter in support of Polk's disability application.  (*Id.* at 1595-96.)  Dr. Janata noted Polk's medication had provided little, if any, relief, and Polk reported "considerable interference" by her pain in her ability to function.  (*Id.* at 1595.)  While ketamine infusions "modestly" reduced Polk's pain and "allowed her to function somewhat better," Polk's pain remained

22

"intense," and her functional impairment remained "quite significant." (*Id.*) Dr. Janata reported Polk scored high on a clinical depression scale, indicating "major depression." (*Id.*) Dr. Janata opined that Polk was "significantly disabled by pain that is inadequately controlled to allow occupational or recreational function and by depression that is the direct result of her pain and functional impairment." (*Id.*)

On December 4, 2019, Polk underwent a ketamine infusion which reduced her pain from a 9/10 to a 2/10. (*Id.* at 1722-23.)

## C. State Agency Reports

### 1. Mental Impairments

On September 19, 2018, Cynthia Waggoner, Psy.D., opined that Polk had moderate limitations in her abilities to understand, remember, or apply information, interact with others, concentrate, persist, or maintain pace, and adapt or manage herself. (*Id.* at 331, 345.) Dr. Waggoner further opined Polk was "limited to simple, routine type work; no production pace; and limited to interacting with others to speak, signal, answer questions, and serve." (*Id.* at 336, 350.) Dr. Waggoner indicated this was an adoption of previous ALJ decision dated June 8, 2018; while there was new evidence in the file, that evidence was not considered to be material. (*Id.*)

On January 5, 2019, on reconsideration, Irma Johnson, PsyD., affirmed Dr. Waggoner's findings. (*Id.* at 364, 368-69, 381, 385-86.)

### 2. Physical Impairments

On September 19, 2018, Bradley Lewis, M.D., opined Polk could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (*Id.* at 333, 347.) Polk could occasionally push and/or pull with her bilateral upper extremities and could occasionally reach overhead with her right upper extremity. (*Id.* at 333-34, 347-48.) Dr. Lewis further opined Polk could frequently climb

ramps/stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 334, 347-48.)  Polk's ability to balance and stoop was unlimited, and she could occasionally kneel and crouch, but never crawl.  (*Id.* at 334, 348.)  Dr. Lewis further opined Polk must avoid all exposure to hazards.  (*Id.* at 335, 348.)  Dr. Lewis explained that this RFC was adopted from a previous ALJ decision dated June 9, 2018.  (*Id.* at 335, 349.)

On January 8, 2019, on reconsideration, Gerald Klyop, M.D., affirmed Dr. Lewis' findings.  (*Id.* at 366-68, 383-85.)

**D.    Hearing Testimony**

During the December 6, 2019 hearing, Polk testified to the following:

- She moved into an apartment in May, where she lived alone.  (*Id.* at 238.)  She was homeless for a year before that.  (*Id.*)  She lived in her car and random places.  (*Id.* at 239.)  She has a driver's license and drives when she needs to go to the doctor.  (*Id.* at 240.)  She may drive every other day; it just depends.  (*Id.*)  She has a bachelor's degree.  (*Id.*)

- Multiple things prevent her from working.  (*Id.*)  She cannot sit for long periods of time.  (*Id.*)  She has pain primarily in her right arm, but also her collarbone and her neck.  (*Id.* at 240-41.)  Working at a computer is difficult.  (*Id.* at 241.)  Her pain is constant throughout the day.  (*Id.*)  Her pain is a 7/10 with medication and a 9/10 without medication.  (*Id.*)  She can sit for ten minutes and stand for ten minutes.  (*Id.* at 241-42.)  She can walk for twenty minutes.  (*Id.* at 242.)  She cannot lift any weight comfortably.  (*Id.*)  Her pain prevents her from sitting, standing, and walking more.  (*Id.*)  She has trouble remembering to take her medication.  (*Id.* at 242-43.)

- She sees her mother and her brother once a week.  (*Id.* at 243.)  Her mother comes to help her at the house.  (*Id.*)  She spends her days reading or listening to music.  (*Id.*)  She reads two five-hundred-page books a week.  (*Id.*)  She sometimes has trouble maintaining her focus or following the story.  (*Id.* at 244.)  She uses a computer, the internet, and social media.  (*Id.*)  She can make change and count money.  (*Id.*)  She does 40% of the chores around the house.  (*Id.* at 244-45.)  Someone else will do the remainder of the chores or it does not get done.  (*Id.* at 245.)  She has a lot of help. (*Id.*)  Once a month a friend will come over or other family members will visit her. (*Id.*)

- One of her medications affects her memory and causes her to be unable to find her words quickly.  (*Id.* at 246.)  Her mental health has deteriorated over the past several years.  (*Id.*)  She feels she has become more isolated and antisocial, and her nightmares and PTSD have gotten worse.  (*Id.*)  Her anxiety has gotten worse, and

she gets panic attacks more frequently. (*Id.*) There have been several changes to her medication, but it does not seem to help. (*Id.*) Her pain, being in crowded places, being rushed, and not knowing what comes next can aggravate her mental health. (*Id.* at 246-47.) She has a lot of triggers. (*Id.* at 247.) Her TENS unit, hot showers and baths, heating pads, ice, and tennis ball massage help her pain. (*Id.*) Walking, being outside, going to calm places, and avoiding high stress environments help her anxiety and depression. (*Id.*) Although her ketamine infusions take her pain away, when she wakes up, she is "horribly nauseous" and has bad headaches, and she feels her brain isn't working right as she cannot speak the way she wants to; it feels as if she is drunk. (*Id.* at 247-48.) It takes two days for that to pass. (*Id.* at 248.)

- She has learned how to do lots of things with her left hand because of her right arm pain. (*Id.*) She drives the car with her left arm and knee. (*Id.*) She does not wash her hair the way she is supposed to and getting dressed is difficult. (*Id.*) She cannot cut root vegetables. (*Id.*) She can reach about three quarters of the way overhead and in front of her, but not without pain. (*Id.* at 249.) She has no problems holding things in her left hand. (*Id.*) She brushes her teeth with her left hand and takes baths instead of showers. (*Id.* at 250.) She does not wear clothes with buttons. (*Id.*) She cannot hold a hair dryer because it is too heavy. (*Id.*)

- She has trouble being around other people. (*Id.*) She gets stressed out and crabby. (*Id.* at 251.) She does not like being in crowds, in line at the grocery store, or being in traffic. (*Id.*) Her patience and tolerance are low, and she is very antisocial and would rather keep to herself. (*Id.*) She does not use public transportation or Uber because she does not like being around people and she does not trust other people to be her driver. (*Id.*) She gets panic attacks that last ten to fifteen minutes multiple times a day. (*Id.*) Stress causes her panic attacks, although it could be anything from traffic to finances. (*Id.* at 252.) It takes her about fifteen to twenty minutes to get back to her baseline after a panic attack. (*Id.*)

- She does not have an issue going to the grocery store for a short trip. (*Id.* at 253.) A longer trip would be problematic because of pushing or pulling the cart, and her groceries would have to stay in the car until someone comes over to carry in the heavy things. (*Id.*)

- She has eight days a month where her pain is above a 7/10 even with her medication. (*Id.*) On those days she does nothing and stays in bed. (*Id.*) She has good days a month as well. (*Id.*) On those days, she does all the things she could not do when she stayed in bed. (*Id.*) Bad days follow good days because she overdoes it. (*Id.* at 254.)

The ALJ directed the VE to assume past work from the prior ALJ decision. (*Id.* at 255.) The ALJ then posed the following hypothetical question:

> [A]ssume a hypothetical individual of the claimant's age and education and with the past two positions that I've identified. Further assume that

hypothetical individual is limited as follows. Hypothetical number one to light except she can occasionally push or pull, never climb ladders, ropes or scaffolds and frequently climb ramps and stairs. She can occasionally kneel and crouch, never crawl and occasionally reach overhead with the right upper extremity with no limits with her left upper extremity. She must avoid all exposure to unprotected heights and heavy dangerous equipment. She must avoid operating dangerous moving equipment such as power saws and jack hammer [sic]. She is limited to simple, routine type work, no production pace and limited to interacting with others to speak, single [sic], ask questions, and serve. First, could that hypothetical individual perform any of the past positions as actually performed or generally performed in the national economy?

(*Id.* at 255-56.)

The VE testified the hypothetical individual would not be able to perform Polk's past work as preschool teacher and director, childcare center. (*Id.* at 256.) The VE further testified the hypothetical individual would be able to perform representative jobs in the economy, such as mail clerk, hand packager, and electronics worker. (*Id.*)

The ALJ modified the hypothetical to add that the hypothetical individual would be off task 15% of the workday. (*Id.* at 256-57.) The VE testified as follows: "Well at 15 percent she's right on the fence. The Dictionary doesn't address off task. I use an engineering system known as methods time measurement. It allows for up to 15 percent in an eight hour day for someone to be off task. At 15 percent they remain employed." (*Id.* at 257.) In response to further questions from the ALJ, the VE confirmed that a person off task up to and including 15% of the time remained employable, but beyond 15% was work preclusive. (*Id.*)

The ALJ added limitations to simple work-related decisions and using her judgment and dealing with changes in the work setting, as well as occasionally interacting with supervisors and coworkers and never interacting with the public, and asked if those limitations would change the VE's testimony. (*Id.* at 257-58.) The VE testified they would not. (*Id.* at 258.)

The ALJ modified the exertional level to sedentary.  (*Id.*)  The VE testified the hypothetical individual could perform representative jobs in the economy, such as patcher, touch up screener, and ampoule.  (*Id.* at 258-59.)

### III.     STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful

activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Polk was insured on her alleged disability onset date, June 9, 2018, and remained insured through September 30, 2022, her date last insured ("DLI"). (Tr. 183, 185, 236.) Therefore, in order to be entitled to POD and DIB, Polk must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2.    The claimant has not engaged in substantial gainful activity since November 8, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: cervical post laminectomy syndrome/failed back surgery syndrome and stenosis; chronic regional pain syndrome/fibromyalgia; depression; anxiety disorder; panic disorder; posttraumatic stress disorder; and bulimia (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant can occasionally operate right and left hand controls; occasionally reach overhead with the right and the left; frequently reach in all other directions with the right and the left; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; never crawl; never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace (i.e assembly line work); limited to simple work related decisions in using her judgment and dealing with changes in the work setting; able to occasionally interact with supervisors and coworkers and never interact with the public; and, in addition to normal work breaks, the claimant would be off task 15% of an eight hour workday.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on April **, 1980 and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 8, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))

(Tr. 187-98.)

## V.     STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).

29

Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of*

*Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A. First Assignment of Error

In her first assignment of error, Polk argues the ALJ erred in failing to review and analyze a medical opinion from Dr. Tabbaa, Polk's "treating spine specialist." (Doc. No. 15 at 12.) Polk asserts Dr. Tabbaa's assessment "made findings regarding [Polk's] residual functional capacity" and her functioning was "significantly more limited" than the ALJ's RFC. (*Id.*)

The Commissioner argues that the restrictions Polk argues supports a more restrictive RFC are not an opinion by Dr. Tabbaa but rather Polk's self-report of her abilities to Dr. Tabbaa's nurse, Ann Zudic. (Doc. No. 17 at 5.) In addition, the ALJ noted Polk's reports of her ability to sit, stand, and walk in his subjective symptom analysis, and cited to both Polk's hearing testimony as well as the treatment notes Polk cites in support of her argument. (*Id.* at 6.)

Since Polk's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the factors set forth in the regulations: (1) supportability;[4] (2) consistency;[5] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. §§ 404.1520c(a), (c)(1)-(5); 416.920c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

---

[4] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[5] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

(1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

(2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. §§ 404.1520c(b)(1)-(3), 416.920c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.*, No. 6:18-cv-01958-BR, 2019 WL 6468560, at *4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. §§ 404.1520c(a), (b)(1); 416.920c(a), (b)(1)).  A reviewing court "evaluates whether

33

the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

In the RFC analysis, the ALJ found as follows:

> The claimant alleged that she cannot sustain full time employment due to a combination of symptoms from her impairments including chronic regional pain syndrome, cervical post laminectomy syndrome; failed back surgery syndrome; cervical spinal stenosis; arthritis; fibromyalgia; major depressive disorder; posttraumatic stress disorder; generalized anxiety disorder; chronic pain syndrome; panic disorder; and bulimia (B3E; B16E; hearing testimony). The claimant testified that she is unable to work because of pain, explaining that her right arm, collarbone, and neck are in constant pain throughout the day and rated them as a 7/10 on the pain scale with medication (and 9/10 without medication). She reported that she cannot use her right arm at all due to right shoulder issues from nerve damage stemming from spinal fusion C5-7, and further reported she cannot sit for long periods or reach above her head (B2A/4). Since November 2017, she advised that her impairments have worsened and cited to nightmares, anxiety, and panic attacks (hearing testimony). The claimant reported that her anxiety symptoms include overthinking everything, socially uncomfortable, worries she is doing something wrong, cannot focus on one thing at a time, loss of control, and feeling very overwhelmed with stressors including financial, housing, relationship, and health (B3F/18). She reported that her conditions are aggravated by crowds, feeling rushed, stress, and lack of fixed schedule; and are improved with a TENS unit, hot shower, ice/heating pad, and by being outside (hearing testimony). *In terms of her physical abilities, the claimant testified that she is able to sit for 10 minutes, stand for 10 minutes, walk for 20 minutes, and lift less than 3 pounds (B2F/11; hearing testimony).*
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.
>
> The claimant's alleged level of impairment and disabling pain is unsupported by the medical evidence of record. The claimant has a history of motor vehicle accident where she injured her neck in 2000 or 2001 and eventually had a C5-7 spinal fusion performed in 2012 (B29F/2). She has a documented history of failed back surgery syndrome, with right-sided neck, shoulder, and arm pain, for which she received ketamine infusions about once per month with some reported relief throughout 2018 and 2019 (B1F; B2F/11; B28F/11; B35F). She reported ongoing pain in her right arm and neck and described it as burning, throbbing sensation localized to neck with radiation to the right arm down to

34

the wrist, with worsening pain when she lifted heavy objects or raising her arm above shoulder level (B28F/11). In June 2019, she reported that the ketamine infusions continued to be helpful in relieving her pain to a degree and enabled improved function, and seemed to do best with monthly infusions (B33F). However, behavioral psychotherapy progress notes also indicated her "function continues to be significantly impaired" despite the benefit of the ketamine infusions, and she also remained reluctant to consider an intrathecal pump for her reported pain based on her apprehension about surgical procedures (B33F/1, 3, 5).

Recent imaging of the claimant's cervical spine – a myelogram from June 2016 – showed remote ACDF connecting C5-6-7, with robust fusion between C5-6 and no hardware failure (B6F/7).  Imaging also showed mild spondylitic impression on ventral cord at C4-5 and C5-6 without significant deformation and noted overall no significant central stenosis (B6F/7). X-rays from June 2016 noted C5-7 anterior fusion without evidence of hardware failure, 2-3 mm C4-5 retrolisthesis, discogenic degenerative changes at C4-5 and C7-T1 with minimal osteophytosis and endplate sclerosis (B13F/32). Additionally, imaging of her thoracic spine were unremarkable (B13F/35). Treatment records also indicate in the past she had attempted pain therapies including physical therapy, injections, tens unit, surgical procedure including cervical fusion, and trigger point injections, but she continued to report that her pain symptoms persisted (B2F/11; B28F/11). She also reported good pain relief with prescribed Tramadol with improved activities of daily living (B28F/11).

Treatment notes from an October 4, 2019 office visit indicated the claimant acknowledged she had made significant improvements overall with her mood and she reported that she was happy with her current course of treatment, indicating further that her functionality had increased since treating with Melinda Lawrence, M.D. (B34F/7-8). Physical exam notes from this office visit also noted her gait was grossly normal and was otherwise unremarkable noting further that her recent/remote memory appeared grossly intact and her mood and affect were also normal (B34F/10). Her pain medication was continued including tramadol 50 mg 3 times per day when necessary for pain, was told she may continue ketamine infusions on an as needed basis, and was encouraged to continue to follow-up with pain psychiatry (B34F/12).

Physical exam findings during the relevant period generally did not support the disabling symptoms alleged. The findings noted some limited active range of motion in the right arm, but were otherwise unremarkable noting full range of motion on passive motion in the right arm, full range of motion in the neck, negative Hoffman sign, grossly normal gait, normal motor strength and sensation, and normal reflexes (B28F/9-10, 14; B34F/10).

\* \* \*

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are not entirely consistent with the claimant's reported daily functioning, examination findings of record, and the weighted portions of the medical opinions. The undersigned notes that while the record shows the claimant experiences symptoms from her conditions, treatment plans during the relevant period were relatively conservative in nature, involving outpatient office visits for medication management of her neck and right arm radiating pain, and ketamine infusion treatments on an almost monthly basis (B1F; B6F; B9F; B13F; B28F; B34F; B35F). Despite her reported disabling physical impairments, she also reported that she performs 40% of the household chores such as cooking, washing the dishes, laundry, dusting, vacuuming, sweeping, and mopping, with her family and friends completing the balance (hearing testimony). She also reported that she could not even lift a milk jug and while there is a documented history of abnormalities in the right upper extremity and signs of chronic regional pain syndrome on examination, the evidence does not support disabling difficulties in the left upper extremity and she reported no difficulties using her left upper extremity to perform typical daily activities, including lifting light objects (B11F; B13F; B28F; B34F; hearing testimony). There is also a note in the record indicating that when the claimant got upset with a provider, she was vigorously writing with her right upper extremity without discomfort (B11F/148).

(Tr. 190-93) (emphasis added.)

As the Commissioner points out, the ALJ specifically considered the treatment notes Polk argues supports a more restrictive RFC.  (*Id.* at 190.)  Furthermore, the ALJ's decision makes clear that the ALJ interpreted those treatment notes as reflecting Polk's subjective reports of her own abilities, which the ALJ found inconsistent with other evidence of record.  (*Id.* at 190-95.)   While Polk interprets the treatment records differently, the findings of the ALJ "are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001).  Indeed, the Sixth Circuit has made clear that an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  There is no error.

36

## B.  Second Assignment of Error

In her second assignment of error, Polk asserts the ALJ "adopted several findings" from the previous ALJ decision regarding Polk's residual functional capacity, including that Polk's impairments would cause her to be off-task 15% of the workday.  (Doc. No. 15 at 12.)  However, Polk argues that this is inconsistent with the current ALJ's determination that Polk's physical and mental conditions "had deteriorated since the summer of 2018, when she appeared before" the previous ALJ.  (*Id.*)  Polk maintains the current ALJ "failed to offer any explanation for this inconsistent finding."  (*Id.*)

The Commissioner responds that Polk is mistaken in her interpretation of the previous ALJ's decision; while the RFC in the closed period of disability included a limitation to being off-task 15% of the time, the RFC after medical improvement occurred omitted the limitation to being off-task 15% of the time.  (Doc. No. 17 at 7.)  In the current decision, the ALJ explained his decision to once again limit Polk to being off-task 15% of the workday.  (*Id.* at 8.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. §§ 404.1546(c), 416.946(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v.*

*Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that

points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The previous ALJ decision found Polk to be disabled from June 1, 2016 through November 7, 2017. (Tr. 303.)  The RFC applicable to the closed period of disability included a limitation to being off-task 15% of the time because of Polk's mental and physical symptoms. (*Id.* at 308.)  However, the RFC in place as of November 8, 2017 omitted any limitation to being off-task 15% of the time. (*Id.* at 316-17.) The previous ALJ decision explained that the limitation to being off-task 15% of the time was no longer required; "[a]s the claimant reported significant pain relief and well controlled symptoms, the undersigned finds the claimant is no longer limited to off task for 15% of the day due to the combination of psychological and physical symptoms." (*Id.* at 317.)

The current ALJ again included a limitation to being off-task 15% of the time during an eight-hour workday. (*Id.* at 189.)  Therefore, there is no inconsistency with the ALJ's determination that new and material evidence regarding Polk's impairments was submitted after the previous ALJ decision dated June 8, 2018. (*Id.* at 184.)  There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: February 1, 2022                    *s/ Jonathan Greenberg*
                                          Jonathan D. Greenberg
                                          United States Magistrate Judge